1

2   ALAN HIMMELFARB (S # 90480)
    KAMBEREDELSON, LLC
3   2757 Leonis Boulevard
    Vernon, California 90058
    Telephone: (323) 585-8696
4   ahimmelfarb@kamberedelson.com

5   JAY EDELSON (*pro hac vice* pending)
    MYLES MCGUIRE (*pro hac vice* pending)
6   KAMBEREDELSON, LLC
    53 West Jackson Boulevard
7   Suite 550
    Chicago, Illinois 60604
8   Telephone: (312) 589-6370
    jedelson@kamberedelson.com
9   mmcguire@kamberedelson.com

10  [Add'l Counsel On Signature Page]

11  Attorneys for Plaintiff
    LINDSEY ABRAMS
12

13              UNITED STATES DISTRICT COURT

14        NORTHERN DISTRICT OF CALIFORNIA—SAN JOSE DIVISION

15

16  | LINDSEY ABRAMS, individually and on | Case No.  C 07-05378 PVT |
    behalf of a class of similarly situated
17  individuals,                          | **PLAINTIFF'S APPLICATION FOR ATTORNEYS' FEES PURSUANT TO STIPULATED ENTRY OF JUDGMENT OF DISMISSAL** |
18              Plaintiff,
19          v.
20  FACEBOOK, INC., a Delaware corporation, | Hearing Date:  July 11, 2008
                                              Time:  9:00 AM
21              Defendant.

22
        **PLAINITFF'S APPLICATION FOR ATTORNEYS' FEES PURSUANT TO
23      <u>STIPULATED ENTRY OF JUDGMENT OF DISMISSAL</u>**

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**NOTICE OF MOTION**

NOTICE IS HEREBY GIVEN that Lindsey Abrams ("Ms. Abrams") will move the Court for an award of Attorneys' Fees Pursuant to Stipulated Entry of Judgment of Dismissal in the above referenced proceedings on July 11, 2008, at 9:00 a.m., or as soon thereafter as counsel may be heard by the above-entitled Court, located at 280 South First Street, San Jose, CA 95113, in Courtroom 3, 5th Floor, before the Honorable Jeremy Fogel.

Ms. Abrams respectfully requests this Court grant her attorneys' fees pursuant to the terms of the settlement reached by the parties as a result of face-to-face and telephonic negotiations between their attorneys. The agreement provides that fees should be awarded based on the benefits conveyed generally by the settlement. As explained below, the settlement's injunctive feature will—using the most conservative analysis available—save recipients of Facebook Mobile text messages over $20.1 million dollars during the settlement period. In consideration of these significant benefits, Plaintiff Abrams respectfully requests attorneys' fees in the amount of $5,033,000.

# TABLE OF CONTENTS

INTRODUCTION ..... 1

I.  BACKGROUND FACTS ..... 2

    A.  Understanding Facebook ..... 2

    B.  The Flaws in Facebook Mobile ..... 3

    C.  The Settlement Terms ..... 4

II.  COMPUTING THE VALUE OF THE BENEFITS CONVEYED BY THE SETTLEMENT ..... 6

    A.  Total Number of Text Messages = 7.8 billion – 11.4 billion ..... 7

    B.  The Opt-Out Rate for SMS Messages = A range of 2.98% – 4.58% ..... 8

        1.  *Recycled Numbers = 100% of 1% - 100% of 2.6%* ..... 8

        2.  *General Opt-Out Rate = 1.98%* ..... 8

    C.  The Cost Per Text Message = $.10 - $.15 ..... 10

    D.  Reductions Based on Legacy Opt-Outs and Costs of Opting Out ..... 10

    E.  The Total Range of Benefits = $25 million to $57 million ..... 11

III.  THE APPROPRIATE PERCENTAGE OF ATTORNEYS FEES ..... 12

IV.  FACEBOOK'S EVASIVE DISCOVERY ANSWERS CANNOT SHEILD THE COMPANY FROM ITS BURDEN TO PAY ATTORNEYS' FEES ..... 15

CONCLUSION ..... 17

# TABLE OF AUTHORITIES

**Cases**

### United States Supreme Court

*Buckhannon Bd. & Care Home, Inc. v. West Virginia Dept. of Health and Human Resources,*
 532 U.S. 598 (2001) .............................................................................. 14

*City of Burlington v. Dague,*
 505 U.S. 557 (1992) ......................................................................... 14, 15

### Ninth Circuit Court of Appeals

*Hanlon v. Chrysler Corp.,*
 150 F.3d 1011 (9th Cir. 1998) ............................................................ 12

*In re Washington Public Power Supply System Securities Litigation,*
 19 F.3d 1291, 1302 (9th Cir. 1994) ..................................................... 14

*Jeff D. v. Andrus,*
 899 F.2d 753, 759 (9th Cir. 1989) ....................................................... 13

*Staton v. Boeing Co.,*
 327 F.3d 938 (9th Cir. 2003) ..................................................... 12, 14, 15

*United Commercial Ins. Serv., Inc. v. Paymaster Corp.,*
 962 F.2d 853, 856 (9th Cir. 1992) ....................................................... 13

*Vizcaino v. Microsoft Corp.,*
 290 F.3d 1043, 1047 (9th Cir. 2002) ................................................... 12

### Other Circuit Courts of Appeal

*Florin v. Nationsbank of Georgia, N.A.,*
 34 F.3d 560 (7th Cir. 1993) ................................................................ 14

### United States District Courts

*Daynard v. MRRM, P.A.,*
 335 F. Supp. 2d 156 (D.Mass., 2004) ................................................. 13

*Fulmore v. Home Depot U.S.A., Inc.,*
 No. 1:03-cv-0797-DFH-JMS, 2007 WL 2746882 at *2 (S.D. Ind. Sept. 19, 2007) ...... 14

*In re Sears Retiree Group Life Ins. Litig.,*
 No. 97 C 7453, 2002 WL 475180 (N.D. Ill. March 27, 2002) ................... 15

1

**California State Courts**

2

3

*Chavez v. Netflix, Inc.*,
       Nos. A114334, A115395, A115571, 2008 WL 1777550 (Cal. App. 1st Dist.) ....... 12, 13

4

*Lealao v. Beneficial California, Inc.*,
       82 Cal. App. 4th 19, 45 (1st Dist. 2000) ................................................................. 13, 15

5

6

**Other State Courts**

7

*Brown v. Drillers, Inc.*,
       630 So. 2d 741, 748 (La.1994) .................................................................................... 13

8

9

*Gardner v. City of Columbia Police Dep't*,
       216 S.C. 219, 57 S.E. 2d 308 (S.C. 1950) ................................................................... 13

10

*Royer Homes of Miss., Inc. v. Chandeleur Homes*,
       857 So.2d 748, 752-53 (Miss. 2003) ........................................................................... 13

11

*Schuster v. Baskin*,
       354 Mass. 137, 140-41, 236 N.E. 2d 205 (Mass. 1968) .............................................. 13

12

13

**Statutes**

14

Telephone Consumer Protection Act, 47 U.S.C. § 227 .......................................................... 15

15

Bus. & Prof. § 6146 ................................................................................................................ 13

16

**Supreme Court Rules**

17

Federal Rule of Civil Procedure 23(e) ...................................................................................... 1

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# INTRODUCTION

Lindsey Abrams brought this case to stop the 6th most-trafficked website in the world, Facebook, Inc. d/b/a Facebook.com ("Facebook"),[1] from bombarding the cellular telephones owned by her and numerous others like her[2] with costly, unauthorized text messages.  Abrams did not initially know the unauthorized text messages had come from Facebook—she was neither a member of Facebook Mobile when she received the messages, nor did the messages clearly disclose their Facebook origin.[3]  (Compl. ¶ 27).  With the assistance of counsel,[4] Abrams learned of Facebook's involvement, filed suit that brought unprecedented claims, and engaged in in-person and telephonic negotiations between her attorneys and Facebook's in-house and outside lawyers.

The result is a strong injunctive settlement that will fundamentally alter how Facebook transmits the *billions* of text messages it will send out over the next 27 months (i.e. the timeframe corresponding to the agreed-upon injunctive relief).[5]  (Stip. Entry of J. ¶ 5).  By clearly identifying that these text messages come from Facebook and providing recipients with an easy way to avoid receiving unwanted messages in the future, consumers will save tens of millions of dollars in unauthorized cellular telephone charges.

---

[1] According to Facebook, the website "is a social utility that helps people communicate more efficiently with their friends, family and coworkers…through the social graph, the digital mapping of people's real-world social connections. http://www.facebook.com/press/info.php ?factsheet (last visited April 22, 2008).

[2] Although this was brought as a class action, it was settled on an injunctive basis only pursuant to Fed.R.Civ.P. 23(e).

[3] Facebook disputes, errroneously, that the text messages it sent failed to conspicuously identify their Facebook connection.  (Answer to Interrogs. 7).

[4] The firm resume of KamberEdelson LLC is attached as Ex. A.

[5] After this time period, Facebook must use commercially reasonable methods to ensure that consumers can opt out of the receipt of future text messages so long as Facebook provides mobile telephone messages in substantially the same manner as it currently does.  To discontinue the injunctive relief altogether, Facebook bears the burden of demonstrating that "material subsequent events, development or occurrences have transpired which can be shown…to reasonably obviate the need therefor."  (Stip. Entry of J. ¶ 5).

**PLAINTIFF ABRAMS' APPLICATION FOR ATTORNEY'S FEES C 07-05378 PVT**

1
2
3
4
5
6
7
8

   The settlement also calls for attorneys' fees to Abrams' counsel.  Facebook has specifically agreed that in the event this Court is called upon to decide the fee amount, the determination will be "based *not solely* on the relief obtained for the plaintiff*, but also **on the benefits conveyed more generally through this settlement**.*"  (Stip. Entry of J. ¶ 6) (emphasis added).  In light of the substantial relief achieved both on behalf of members of Facebook and the cellular telephone-owning public generally, Abrams respectfully requests $5,033,000 in attorneys' fees, reflecting 25% of the most conservative valuation of the settlement benefits.

9

## I.    BACKGROUND FACTS

10

## A.    Understanding Facebook

11
12
13
14
15
16
17
18
19
20

   Facebook is an Internet success story with few peers.  Started in 2003 in a university dorm room, Facebook experienced rapid growth since its inception and stands today as one of only a handful of multi-billion dollar corporations at the vanguard of the Internet.  Initially comprised primarily of college students and young people, today Facebook's membership attracts persons of all ages and walks of life.  With more than 70 million active users, the Facebook website "enables companies and engineers to…gain access to millions of users…[and] [m]ore than 50 percent of Facebook users return to the site each day, providing unparalleled distribution potential…."  http://www.facebook.com/press/info.php?factsheet (last visited April 22, 2008).

21
22
23
24
25

   At issue here is one of Facebook's most prominent applications, Facebook Mobile, which allows users to send and receive short-message-service (SMS) messages, also known as text messages, to users' mobile devices (cellular telephones, personal digital assistants, etc.).  (*See* Declaration of R. Snyder, ¶ 4, a true and accurate copy of which is attached as Ex. B).[6]  To

26
27
28

---

[6] Mr. Snyder is an independent mobile telecommunications technology consultant with 24 years of experience and is an expert in the field of mobile and cellular telecommunications.  He spent seven years developing standards within the American National Standards Institute's (ANSI) subsidiary organization, the Telecommunications Industry Association (TIA), providing technical contributions and authoring and editing mobile telecommunications proposed standards

PLAINTIFF ABRAMS' APPLICATION FOR
ATTORNEY'S FEES
C 07-05378 PVT

receive these text messages, a Facebook member registers her cellular telephone number into her Facebook profile.  (Snyder Decl. ¶¶ 4-5).  The member's Facebook "friends" can then log onto the website, visit the member's profile page, and send text messages to the member's mobile telephone device.  (Snyder Decl. ¶ 5).  Importantly, the Facebook member associated with sending the text message need not even know the cellular telephone number of the intended text message recipient to send the text message; rather, all that is required is access to the recipient's Facebook profile page.  (Snyder Decl. ¶¶ 4-5).  Approximately 14 million text messages were sent to mobile phones via Facebook Mobile in January 2007; the number of text messages sent has since followed a trajectory of exponential growth, climbing to 59.9 million messages monthly by January 2008.  (*See* Facebook's Answers to Interrogatories, 2(c), a true and accurate copy of which is attached as Ex. C; Snyder Decl. ¶ 8).

**B.      The Flaws in Facebook Mobile**

The first major problem with Facebook Mobile is that not everyone who receives text messages sent through the application has authorized the transmission.  (Snyder Decl. ¶ 7).  For Abrams, the issue began when she received a "recycled" telephone number [7] from her wireless service provider.  (Compl. ¶ 19).  The number's prior owner had registered the number with Facebook Mobile, but no one, including Facebook's wireless carrier partners, disclosed this to Abrams.  (Compl. ¶ 20).  Facebook users then went onto Facebook to send the prior owner text messages, which instead went to Abrams because she was the number's current owner.  (Compl. ¶¶ 19-25).  Because Abrams was never a member of Facebook Mobile, and the messages were

documents.  Most notably, Mr. Snyder co-founded m-Qube, Inc., a leading billing and processing company, or "aggregator," in the mobile content industry.  (Snyder Decl. ¶¶ 1-3)

[7] A recycled number is one that was previously used by a prior customer of the wireless carrier (*i.e.* AT&T, Verizon Wireless, Sprint, Alltel etc.).  When the customer canceled his or her service with the carrier, the carrier re-assigned the number to a new customer.  (Compl. ¶¶ 19-20).  Prior to re-assigning the number, however, the carriers failed to clean the number, or remove from it any text message services, such as Facebook Mobile, for which the number had been registered.  (Compl. ¶¶ 19-20).

**PLAINTIFF ABRAMS' APPLICATION FOR ATTORNEY'S FEES C 07-05378 PVT**

1    unclear as to their Facebook connection, she knew of no method by which she could prevent these

2    text messages—for which she was required to pay (and in fact paid) $.10 each—from being sent

3    to her phone.  (Compl. ¶¶ 27-29).

4        Facebook was aware of the extent of this "recycling" problem, even as it profited from

5    this practice.  Prior to this lawsuit, Facebook had implemented a program with AT&T and

6    Verizon whereby the carriers would provide Facebook with notices of telephone numbers that had

7    been deactivated.  (Answer to Interrogs., 6).  AT&T provided deactivation notices starting in May

8    2006, but "in late 2006, a technical problem arose, and AT&T stopped sending such notices."

9    (Answer to Interrogs., 6).  AT&T resumed providing notice in "October/November 2007."

10   (Answer to Interrogs., 6).  Verizon eventually began sending such notices in November 2007.[8]

11   (Answer to Interrogs., 6).  Facebook, however, did not require any other wireless service

12   providers, which collectively service approximately 50 percent of all U.S. cellular telephone

13   customers, to apprise it of deactivations.  (Answer to Interrogs., 6).

14

15       Another major problem afflicting Facebook Mobile is that it fails to provide meaningful

16   opt-out instructions on a regular basis to text message recipients, even to those who had at one

17   time authorized Facebook Mobile.  As Facebook's own discovery responses attest, some

18   Facebook Mobile users do not remain members indefinitely and elect to discontinue their receipt

19   of Facebook text messages altogether.[9]  Numerous reasons contribute to this dynamic, such as the

20   per instance cost of each text message, the inability to filter desirable text messages from

21   undesirable, and the emergence of unwanted mobile advertisements.  (Snyder Decl. ¶ 14-16).

22

23   **C.    The Settlement Terms**

24       The settlement agreement combats the unwanted text message problem in three critical

25

26   _____

27   [8] As a point of reference, Abrams filed the instant case October 22, 2007.

28   [9] Approximately 3.2% of Facebook Mobile users have elected to opt-out prior to the Settlement Agreement.  (Frankenfeld Exp. Rep., 3).

4

ways. (Snyder Decl. ¶ 6). First, it requires Facebook to brand each text message sent out as originating from "Facebook." This will notify non-members such as Abrams of the origin of the text messages so they can contact Facebook simply and effectively to stop the problem. (Stip Entry of J. ¶ 1). Second, Facebook will now include specific opt-out instructions in the body of every 15th text message sent to a particular telephone number. Recipients will be able to avoid future text messages by replying to the message with the word "Off." (Stip. Entry of J. ¶ 1). Third, Facebook will implement improved notification procedures with the wireless carriers sufficient to maintain accurate and updated telephone number deactivation and recycling logs. (Stip. Entry of J. ¶ 3). Accordingly, the settlement enables recipients to avoid receiving these unwanted text messages and incurring related service fees imposed by their wireless carriers. (Snyder Decl. ¶¶ 6-7).

Additionally, the settlement provides that Facebook will pay for Plaintiff's attorneys' fees and a reasonable award to Ms. Abrams. By agreement, the parties specifically contracted as to how attorneys' fees are to be determined and, if necessary, the parameters for Court determination:

> Facebook agrees that plaintiff's counsel is entitled to a reasonable award of attorneys' fees and expenses in an amount to be determined by the parties, or failing such an agreement, by the Court. *Facebook agrees that any such determination by the Court will be based not solely on the relief obtained for the plaintiff, but also on the benefits conveyed more generally through this settlement. Facebook further agrees that plaintiff shall be entitled to reasonable, limited discovery on this issue, including information relating to (a) the number of text messages Facebook sends out on a daily basis, (b) the number of text messages sent to previously to recycled numbers, and (c) the steps Facebook did or did not previously take to ensure that text messages were not sent to people who did not want them.* The parties have agreed that plaintiff's counsel shall submit to the Court in the Action an application in support of an award to plaintiff's counsel of fees and costs, and that an evidentiary hearing (on such terms as the Court determines are appropriate) shall be held in respect thereto (at a time to be set by the Court) and further that, in connection therewith, Facebook shall be entitled to object to or otherwise contest the amounts to be awarded plaintiff's counsel via written submissions and briefs and orally at the hearing on such application. The parties state further that it is their collective intention to expedite the process of

5

1
2
3

> conducting the forgoing evidentiary hearing and enabling the necessary judicial determinations.  Facebook agrees not appeal the District's Court's final Order with respect to such application and to pay any amounts awarded thereby within thirty (30) calendar days of the entry of the final order thereon.

4   (Stip. Entry of J. ¶ 6) (emphasis added).  Upon such a determination, Facebook agreed to pay the

5   amount awarded within 30 days. (Stip. Entry of J. ¶ 6).  Further, Facebook has explicitly waived

6   any right to appeal.  (Stip. Entry of J. ¶ 6).  Since executing the Stipulated Order, Facebook has

7   refused to seek a private determination of the amount of the attorneys' fees, which has

8
9   necessitated Plaintiff's submission of this application pursuant to Paragraph 6 of the Stipulated

10  order of Judgment.  Plaintiff respectfully requests that this Court honor the parties' intent—as

11  embodied in the agreement—and award reasonable fees based on the value of the benefits

12  conveyed through the settlement.

13  **II.    COMPUTING THE VALUE OF THE BENEFITS CONVEYED BY THE**
14          **SETTLEMENT**

15          At its most basic, the settlement is designed to spare cellular telephone owners of the

16  inconvenience and cost associated with receiving unauthorized text messages from Facebook.

17  The actual value to all potential recipients is calculated through intuitive yet straightforward math.

18  To that end, the settlement's value is the product of the number of text messages sent by

19
20  Facebook during the minimal settlement term, multiplied by the number of the recipients who

21  opt-out during the term and the cost to each recipient of receiving text messages.

22          Of course, prudent arithmetic dictates the subtraction of amounts for which the settlement

23  cannot take credit.  For example, each individual who opts out may incur charges for the 15 text

24  messages received from Facebook, plus an additional message the user must send to stop the text

25  messages.  This money is properly excluded from being considered part of the settlement's

26  benefits.  Additionally, a range of 2,000–4,000 users had deactivated monthly from Facebook

27  Mobile prior to the start of the settlement's corrective measures.  (Answer to Interrogs., 3).

28

**PLAINTIFF ABRAMS' APPLICATION FOR
ATTORNEY'S FEES
C 07-05378 PVT**

1   Neither Abrams nor her counsel may claim the benefit of these "legacy opt-outs."

2        In equation form, then, the General Settlement Benefits appear as follows:

3   **GSB = [total # of texts x opt-out rate x cost per text] – [legacy opt-outs + cost of opting out]**

4   Each of these variables, and the expert opinions that support them, are explained below.

5
6   **A.    Total Number of Text Messages = 7.8 billion – 11.4 billion**

7        Facebook transmits a massive number of text messages, and, as explained in the

8   declaration of industry expert Randall Synder, the number is growing rapidly.  During the

9   calendar year from January 2007 to January 2008, Facebook Mobile experienced an average

10  month-to-month growth rate in text message volume of 12.9%, which resulted in Facebook

11  sending 59.9 million text messages in the month of January 2008 alone.  (Answer to Interrogs. 2;

12  Snyder Decl. ¶ 8).  Mr. Snyder cautiously predicts more modest growth going forward, however,

13  due to "the waning novelty of the Facebook Mobile application among users as well as a natural

14  anticipated decline in ongoing growth rates."  (Snyder Decl. ¶ 9).  Also, a further rate reduction is

15  necessary in light of the fact that settlement will result in members opting-out of Facebook

16  Mobile.  (Snyder Decl. ¶ 11).  Thus, Mr. Snyder surmises, "a conservative monthly growth rate

17  through mid-year 2010 in the range of 9% to 11% is reasonable."  (Snyder Decl. ¶ 9).

18
19       Mr. Snyder further cautions that the effects of the settlement are unlikely to be realized in

20  the initial weeks following implementation.  Though Facebook is required to send opt-out

21  instructions and identification notices for a period of 27 months, the corrective action must first

22  be allowed to permeate the Facebook Mobile user base.  (Snyder Decl. ¶ 10).  Therefore, Mr.

23  Snyder projects that this will require approximately 3 month's time, meaning the relevant period

24  is limited conservatively to the final 24 months.  (Snyder Decl. ¶ 10).  Mr. Snyder calculated the

25  approximate number of text messages that will be sent by Facebook during that period at 9% and

26  11% monthly growth respectively.  (Snyder Decl. ¶ 9).  Projecting 9% growth amounts to 21

27
28

1   million users sending a total of approximately 7.8 billion text messages through Facebook Mobile
2   during the restricted injunctive period.  (Snyder Decl. ¶ 9).  For 11% growth, the total reaches
3   11.4 billion text messages from approximately 36 million users.  (Snyder Decl. ¶ 9).
4
    **B.    The Opt-Out Rate for SMS Messages = A range of 2.98% – 4.58%**
5
6           Prior to the settlement, users wishing to discontinue the text messages were required to log
7   onto the Facebook website and cumbersomely navigate their way to a link that would shut-off the
8   application.  Non-users encountered more obstacles.[10]  Presenting clearer notice and instructions
9   to all recipients will result in a materially greater opt-out rate.  (Snyder Decl. ¶ 7).  Two rates are
10  at play:  recycled numbers and general opt-outs.
11
    **1.    *Recycled Numbers = 100% of 1% - 100% of 2.6%***
12
13          First, for people like Ms. Abrams who never signed up for Facebook Mobile in the first
14  place, it is reasonable to conclude an opt-out rate of 100%—the only messages they receive are
15  intended for other people, and it is costing them money.  There is no reason to suspect they will
16  elect to continue to receive these text messages in the future.  (Snyder Decl. ¶ 7).  Based on
17  figures provided by the Federal Communications Commission ("FCC"), Mr. Snyder calculates
18  that between 1–2.6% of all cellular telephone numbers in the United States, including those
19  registered on Facebook Mobile, are recycled monthly.  (Snyder Decl. ¶ 7).
20
    **2.    *General Opt-Out Rate = 1.98%***
21
22          The settlement also benefits all recipients of Facebook text messages generally by
23  informing them how to opt-out.  The general opt-out rate for recipients of Facebook text messages
24  will be 2%.  (Snyder Decl. ¶ 15).
25

26  [10] Facebook has indicated in its interrogatory responses that prior to the settlement, it recognized
    terms such as "STOP" or "END" and that it would honor such responsive texts sent by recipients
27  of Facebook texts by ceasing to send messages.  (Answer to Interrogs., 6).  While this could
    potentially be true, it was of little value given that Facebook  provided no effective notice to text
28  message recipients that it accepted such requests.

**PLAINTIFF ABRAMS' APPLICATION FOR**
**ATTORNEY'S FEES**
**C 07-05378 PVT**

Given the relative youth of text messaging as a viable communications medium, Mr. Snyder bases his opinion on the opt-out rates for email, where research has shown that approximately 2% of email subscribers will opt-out of receiving future emails when provided the chance to do so. (Snyder Decl. ¶ 15). Mr. Snyder explains conceptually that the opt-out rate for text messaging is likely to far exceed that of email for a variety of reasons. (Snyder Decl. ¶ 15). First, people take notice of their unwanted text messages. Whereas email is free to receive, most text message recipients are charged on average between $.10 to $.15 per message. (Snyder Decl. ¶ 15). Also, email applications have spam filters, "junk email" programs, and other devices designed to quarantine unwanted email communications. (Snyder Decl. ¶ 15). Consequently, one would expect that if presented the opportunity, recipients of unwanted text messages would opt-out with far greater frequency than recipients of emails. (Snyder Decl. ¶ 15).

Nevertheless, and again erring on the conservative side, Snyder does not speculate just how much greater the text message opt-out rate will be over email. Using email rates then as both a floor and ceiling, Mr. Snyder's 2% rate is a cautious projection of the percent of Facebook Mobile members who will elect to discontinue the service as a result of the settlement.

This aspect of the equation requires one additional step. The rates for recycled numbers and general opt-outs cannot simply be added together. Rather, the 2% general opt-out rate may only apply to the 99% of messages that remain after subtracting out the 1% from the recycled number recipients. Adjusting for this overlap results in a general opt-out rate of 1.98%.[11] (*See* "Expert Report of D. Frankenfeld, 2, a true and accurate copy of which is attached as Ex

---

[11] Accounting for the overlap if the higher opt-out rate for recycled numbers (2.6%) were used would result in a general opt-out rate of 1.948%. As this Application adopts the lowest opt-out rate for recycled numbers (1%), however, the general opt-out rate to be used going forward with the analysis will be 1.98%.

**PLAINTIFF ABRAMS' APPLICATION FOR ATTORNEY'S FEES C 07-05378 PVT**

1    D).[12]  Accordingly, adding this adjusted rate for general opt-outs to the range for recycled opt-

2    outs results in a total opt-out range of 2.98%–4.58% for all text messages.

3    **C.      The Cost Per Text Message = $.10 - $.15**

4          Recipients incur charges from their respective wireless service providers, frequently on a

5    per text message basis.  (Snyder Decl. ¶ 12).  "AT&T Mobility, Verizon Wireless, Sprint Nextel

6    and T-Mobile, the four largest domestic wireless carriers by market share, all charge individual

7    text message fees of $0.15 per message, according to their respective websites, and such amount

8    may increase over the Settlement Period."  (Snyder Decl. ¶ 12).  Ms. Abrams was charged $.10

9    per text message.  (Snyder Decl. ¶ 10; *see also* Compl. ¶¶ 27-29).  Accordingly, Mr. Snyder

10   opines that for the settlement period, "an average fee of between $0.10 and $0.15 per text

11   message both sent and received is reasonable."  (Snyder Decl. ¶ 12).

12         Revisiting our equation then, the first half ranges look like this:

13   **GSB = [7.8 billion x .0298 x .10] – [legacy opt-outs + cost of opting out]** on the low end to

14   **GSB = [11.4 billion x .0458 x .15] – [legacy opt-outs + cost of opting out]** on the high end.

15   **D.      Reductions Based on Legacy Opt-Outs and Costs of Opting Out**

16         Plaintiff cannot take credit for all the money that is going to be saved based on opt-outs

17   over the settlement period.  First, and as noted previously, 2,000–4,000 Facebook Mobile

18   members deactivated the service monthly prior to the start of the settlement.  (Answer to

19   Interrogs. 3).  Economist Donald L. Frankenfeld calculated the extent of the issue and found the

20   legacy opt-out rate was approximately 3%.  This translates into recipients opting out each month

21   who the settlement cannot champion.  (Frankenfeld Exp. Rep. App. 1-9).

22         The second issue addresses the reality that the opt-out instructions are not sent to text

23   message recipients until the 15th message, and a recipient must text "OFF" in a reply message to

_____

[12]  Mr. Frankenfeld is a forensic economist and financial expert, with a specific expertise in
computer modeling of economic damages.  (Frankenfeld Exp. Rep., 1).

Facebook (16 total messages).  These costs to recipients who opt out should not be considered in the general benefits.  At $.10 per message, this results in $1.60 per recipient who opts out, or $1,590,677 (at 9% growth) or $2,695,131 (at 11% growth) being subtracted from the total settlement benefits. (Frankenfeld Exp. Rep. App. 1 and 7).  At $.15 per message, $2.40 for every person who opts out, or $2,386,015 (at 9% growth) or $4,042,697 (at 11% growth) total should be subtracted.  (Frankenfeld Exp. Rep. App. 3 and 9).

Indeed, many individuals will opt-out prior to the 15th message.  Non-members will likely learn of the opt-out instructions through news reports, word of mouth, or other means.  Facebook users could post messages that would instantly reach wider audiences on the website itself.  Ms. Abrams, by her counsel and experts, declines to speculate as to the impact of these realities and instead adheres to the common sense notion that a recipient should have to incur no more than $1.60–$2.40 to effectively opt-out of Facebook Mobile and achieve the settlement's benefits.

Subtracting these values, the equation presents a range of benefits from:

**GSB = [7.8 billion x .0298 x .10] – [3.2% + ($1.60 to $2.40)]** on the low end to

**GSB = [11.4 billion x .0458 x .15] – [3.2% + ($1.60 to $2.40)]** on the high end.

**E.    The Total Range of Benefits = $25 million to $57 million**

Mr. Frankenfeld has provided exhaustive spreadsheets detailing the potential ranges if different combinations of each variable are used.  (*See* Frankenfeld Exp. Rep. App. 1-9).  Following the mathematical model, a reasonable range of settlement benefits to users and non-users equals between $25,967,094 and $57,234,736.  Broken down, the ranges produced equal:

| Call Value | | Snyder Low | Snyder Middle | Snyder Upper |
|---|---|---|---|---|
| ↦ | | $0.100 | $0.125 | $0.150 |
| Growth | 9.0% | $25,967,094 | $32,458,867 | $38,950,641 |
| | 10.0% | $31,457,205 | $39,321,506 | $47,185,808 |
| | 11.0% | $38,156,491 | $47,695,613 | $57,234,736 |

11

(Frankenfeld Exp. Rep., 4).  These results take the mid-range value of each chart in Mr.

Frankenfeld's appendix and show that the settlement will provide recipients of unwanted

Facebook Mobile messages with substantial relief—ultimately saving them millions of dollars in

unauthorized text messaging fees.

      With respect to which figure most accurately depicts the settlement benefits, the mid-

range point reasonably takes into account each of the different variables in the equation.  The

benefits achieved by this settlement could be much greater, of course, eventually hitting north of

the $70 million mark.  (Frankenfeld Exp. Rep. App. 9).  In the final analysis, however, Plaintiff is

prepared to limit her projection to the low end figure, representing a bare minimum of the actual

anticipated relief to message recipients.  This number presumes the shortest injunctive period (24

months), the slowest growth rate (9%), the lowest opt-out rates (2.98%), and the lowest per

message value ($.10, a full 33% lower than the amounts currently being charged by the major

wireless carriers).  Accordingly, Plaintiff respectfully submits the general settlement benefits

conferred by the parties agreement equals no less than $20,134,762, as reflected in the first page

of Mr. Frankenfeld's appendix.

## III.    THE APPROPRIATE PERCENTAGE OF ATTORNEYS FEES

      Having calculated the general benefits, the question remains as to what represents an

appropriate fee award.[13]  In class action cases, courts have recognized a benchmark fee award of

25%.  *See Staton v. Boeing Co.*, 327 F.3d 938 (9th Cir. 2003), *Vizcaino v. Microsoft Corp.,* 290

F.3d 1043, 1047 (9th Cir. 2002), *Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998).

California law further recognizes contingency fees in the marketplace provide a range of 20–40%.

*See e.g., Chavez v. Netflix, Inc.*, Nos. A114334, A115395, A115571, 2008 WL 1777550 (Cal.

---

[13] The Court's determination of "reasonableness" arises from the terms of the settlement
agreement, and, unlike class actions, not from any legal imperative.  However, Abrams believes
class action and personal injury decisions provide relevant guidance as to percentages of value
found to be reasonable and reflective of the marketplace.

1 App. 1st Dist.) (discussing marketplace fee ranges and their applicability when determining

2 proper fee percentages based on value of settlement); *see also Lealao v. Beneficial California,*

3 *Inc.* 82 Cal. App. 4th 19, 45 (1st Dist. 2000) (considering the amount of the proposed award and

4 the monetizeable value of the class benefits to estimate what the market would pay for

5 comparable litigation services rendered pursuant to a fee agreement); *see also* Bus. & Prof. §

6 6146 (setting contingency fee percentages in medical malpractice cases).

7

8      As a result, a reasonable fee from the low-end of the range would be $5,033,690.50 (25%

9 of $20,134,762). This figure represents 12.8% of the mid-range ($39,321,506)[14] and a mere

10 8.79% of the high-end projection ($57,234,736).[15] Taking the mid-point range, 25% would have

11 equaled a fee award of $9,830,376.50 and $14,308,684.00 for the high-end. Again, in keeping

12 with the spirit of this application's cautious temperament, Abrams limits her request to the bottom

13 figure, despite the expert's opinion that the mid-range presents a more accurate assessment of the

14 benefits.

15

16      To be sure, the parties specifically bargained for a settlement of the attorneys' fees issue

17 to be based broadly on the relief afforded through the settlement. It is well settled that "[t]he

18 construction and enforcement of settlement agreements are governed by principles of local law

19 which apply to interpretation of contracts generally." *United Commercial Ins. Serv., Inc. v.*

20 *Paymaster Corp.*, 962 F.2d 853, 856 (9th Cir. 1992) (*quoting Jeff D. v. Andrus*, 899 F.2d 753,

21 759 (9th Cir. 1989)).[16] Parties have flexibility in negotiating settlement agreements, "including

22

23

24 ───────────────────

[14] To be clear, $39,321,506 is the mid-point for 10% growth at $.125 per message. (Frankenfeld Exp. Rep. App. 5).

25 [15] $57,234,736 is the mid-point for 11% growth at $.15 per message. (Frankenfeld Exp. Rep. App. 9).

26 [16] Sister jurisdictions agree that settlements are subject to ordinary contract interpretation. *See, e.g., Brown v. Drillers, Inc.*, 630 So. 2d 741, 748 (La.1994); *Schuster v. Baskin*, 236 N.E. 2d 205

27 (Mass. 1968); *Royer Homes of Miss., Inc. v. Chandeleur Homes*, 857 So.2d 748, 752-53 (Miss. 2003); *Gardner v. City of Columbia Police Dep't*, 57 S.E. 2d 308 (S.C. 1950). *Daynard v. MRRM,*

28 *P.A.*, 335 F. Supp. 2d 156 (D.Mass. 2004).

**PLAINTIFF ABRAMS' APPLICATION FOR
ATTORNEY'S FEES
C 07-05378 PVT**

the attorneys' fee provisions." *Staton*, 327 F.3d at 972 n. 22 (describing potential models for class action settlements on common-fund and statutory fee-shifting principles)[17] (*relying in part on Florin v. Nationsbank of Georgia, N.A.*, 34 F.3d 560 (7th Cir. 1993)).

This is true even when other legal principles would apply if not for the settlement terms. For example, in *Florin* the parties agreed to settle an ERISA case through the creation of a common fund, and that attorneys' fees for class counsel would be paid out of the fund itself. 34 F.3d at 562. Since the ERISA statute contained a fee-shifting provision, however, the district court denied class counsel a multiplier under the holding of *City of Burlington v. Dague*, 505 U.S. 557 (1992) (prohibiting multipliers in cases with federal fee-shifting statutes). 34 F.3d at 564-65. On appeal, the Seventh Circuit honored the intent of the parties and found that because the settlement was made on a common fund basis, *Dague* did not apply despite the fact it otherwise would have acted to bar a multiplier. *Id*.

Likewise, the court in *Fulmore v. Home Depot U.S.A., Inc.*, awarded fees under settlement provisions where the lawsuit had triggered a defendant's voluntary change in business practices. No. 1:03-cv-0797-DFH-JMS, 2007 WL 2746882 at *2 (S.D. Ind. Sept. 19, 2007) (Slip. Op.). Although the Supreme Court had abolished the use of such a "catalyst theory" in federal fee-shifting cases in the case of *Buckhannon Bd. & Care Home, Inc. v. West Virginia Dept. of Health and Human Resources*, 532 U.S. 598 (2001), the *Fulmore* court reasoned:

---

[17] This matter, however, should not be confused with a class action common fund—because there is only injunctive relief, counsel's interests are not antagonistic to those of the class members (no increase in the fee amount will result in a corresponding reduction of relief to the class). *See In re Washington Public Power Supply System Securities Litigation*, 19 F.3d 1291, 1302 (9th Cir. 1994) (in common fund cases the relationship between plaintiffs and their attorneys turns adversarial at the fee-setting stage). Rather, the parties here agreed to apply understood legal principles so as to help them, and if necessary this Court, calculate the fee award, and this calculation is wholly independent of the relief afforded to recipients of unwanted Facebook Mobile text messages.

1
2
3
4

> In this case, ultimately, the court is being called upon to apply and enforce the intentions of the parties, as expressed in their agreements. Those agreements not only allow for the possibility of a fee award, notwithstanding the rule under *Buckhannon* and its progeny, but go further and clearly indicate that a fee award in a reasonable amount was anticipated and would be appropriate.

5

2007 WL 2746882 at *2; *see also In re Sears Retiree Group Life Ins. Litig.*, No. 97 C 7453, 2002

6

WL 475180 (N.D. Ill. March 27, 2002) (applying common fund principles instead of lodestar

7

where provision of settlement agreement for fees stated Sears could not argue for lodestar or

8

application of *Dague*). Accordingly, honoring the intent of the instant parties requires a fee based

9

on a percentage of the benefits generally conveyed by the settlement.

10
11

**IV.    FACEBOOK'S EVASIVE DISCOVERY ANSWERS CANNOT SHEILD THE COMPANY FROM ITS BURDEN TO PAY ATTORNEYS' FEES**

12

Courts may consider injunctive relief's value to individuals where the value of the

13

injunctive relief may be accurately ascertained or monetized. *Lealao*, 82 Cal. App. 4th at 45; *see*

14

*also Staton*, 327 F.3d at 974 (the relief must be more tangible than a redress of a general social

15

grievance).[18]  If its discovery responses are any indication, Facebook is likely to argue that the

16

settlement benefits here are too speculative for valuation.  Facebook objected when asked to

17

provide an estimate of the value of the settlement benefits on the grounds that the term "benefits"

18

is "vague, ambiguous and unintelligible," that the interrogatory calls for the opinions of attorneys

19

in violation of work product, and for "speculation" and "hypothetical opinion."  (Answer to

20

Interrogs., 12).  This is not true.  Putting aside the fact that Facebook's position suggests it

21

willingly agreed to settlement language it found ambiguous so as to frustrate the intentions of the

22

parties, the settlement itself helps define what is meant by "benefits."  The agreement calls for

23
24

discovery on this issue in the form of "*(a) the number of text messages Facebook sends out on a*

25
26

---

[18] The settlement protects message recipients from intrusions into their telephone devices, a privacy concern reflected in statues such as the Telephone Consumer Protection Act, 47 U.S.C. § 227.  The settlement's redress of this social grievance is too speculative to quantify, however, rendering it properly excluded from the attorney's fees calculation.

27
28

**PLAINTIFF ABRAMS' APPLICATION FOR ATTORNEY'S FEES**
**C 07-05378 PVT**

*daily basis, (b) the number of text messages sent to previously recycled numbers, and (c) the steps Facebook did or did not previously take to ensure that text messages were not sent to people who did not want them.*" (Stip. Entry of J. ¶ 6) (emphasis added). Accordingly, Facebook's sudden lack of understanding does not reflect well on its intentions.

Finally, the expert opinions contained in the attached declarations show the valuation to be both understandable and reasonable. The math is neither complicated or beyond the point where the benefits may be accurately ascertained. These messages cost recipients money; they will save money going forward. While the exact dollar figure of the benefits is unavailable, such exactitude is not required by the settlement agreement—the parties agreed on language that suggests a more general valuation. According to an industry expert and an economist, the settlement value is between $25,967,094 and $57,234,736. Abrams errs more cautiously than these monetizations and uses the most conservatively generated figure, $20,134,762, to support a fee application of $5,033,000.

1

**CONCLUSION**

2

   Abrams and Facebook settled for injunctive relief that will save the recipients of Facebook

3

Mobile text messages millions of dollars.  Central to the bargain was the provision that requires—

4

5

in the event the Court is to decide attorney's fees—that the calculation be based on the benefits

6

conveyed generally by the settlement.  Expert modeling of the relief has demonstrated that the

7

monetizable settlement benefits range from $25,967,094 to $57,234,736.  This is not speculation,

8

but is rather the product of thoughtful and reasonable mathematics.  Abrams, however, limits her

9

request to 25% of the lowest figure in the lowest range, being $20,134,762.  Given these

10

substantial benefits, a fee award of $5,033,000 is reasonable and appropriate under the terms of

11

the settlement.

12

                                        Respectfully submitted,

13

                                        KAMBEREDELSON, LLC
14                                      SCOTT A. KAMBER

15

16                                      /s/ Scott A. Kamber
                                        Attorneys for Lindsey Abrams
17

Jay Edelson
18 Myles McGuire
Steven Lezell
19 KAMBEREDELSON, LLC
53 West Jackson Bvld., Suite 550
20 Chicago, Illinois 60604
(312) 589-6370
21

Scott A. Kamber
22 KAMBEREDELSON, LLC
11 Broadway, 22nd floor
23 New York, NY  10004
(212) 920-3072
24

Alan Himmelfarb
25 KAMBEREDELSON, LLC
2757 Leonis Boulevard
26 Vernon, California 90058
(323) 585-8696
27

28

**PLAINTIFF ABRAMS' APPLICATION FOR
ATTORNEY'S FEES
C 07-05378 PVT**