**EXHIBIT B**

KAMBEREDELSON, LLC
ALAN HIMMELFARB
2757 Leonis Boulevard
Vernon, California 90058
Telephone: (323) 585-8696

Attorneys for Plaintiff
LINDSEY ABRAMS

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| LINDSEY ABRAMS, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiff,<br><br>v.<br><br>FACEBOOK, INC., a Delaware corporation,<br><br>Defendant. | Case No. C 07-05378 PVT<br><br>**DECLARATION OF RANDALL A. SNYDER** |

## DECLARATION OF RANDALL A. SNYDER

I, Randall A. Snyder, hereby declare as follows:

**I. Professional Background**

1. My name is Randall A. Snyder. I am an independent mobile telecommunications technology consultant and reside at 8113 Bay Pines Avenue, Las Vegas, Nevada, 89128. I have been retained by the law firm of KamberEdelson, LLC to provide my opinions on issues concerning mobile short message service (SMS) technology,

DECLARATION OF RANDALL A. SNYDER

commonly known as mobile text messaging, the use of this technology by Facebook, Inc., and the matters at issue in the instant litigation.

2. I have over 24 years of experience in mobile telecommunications network and system architecture, engineering, design and technology. I consider myself to be an expert in the field of mobile and cellular telecommunications, mobile and cellular networking technology and specifically short message service technology. A copy of my *curriculum vitae* is attached to this declaration.

3. I have taught many classes and seminars on mobile telecommunication network technologies and have been a panelist and speaker at numerous conferences at the Institute of Electrical and Electronics Engineers (IEEE), the Personal Communication Society (PCS), and the Cellular Telecommunications and Internet Association (CTIA) as an expert in mobile telecommunication networks. I spent seven years developing standards within the American National Standards Institute's subsidiary organization, the Telecommunications Industry Association (TIA), providing technical contributions and authoring and editing mobile telecommunications proposed standards documents. Most notably, I authored and oversaw the standardization of Interim Standard 93, providing interconnection technology between wireline and mobile networks, which is now a fully accredited national standard of the American National Standards Institute (ANSI). I am the author of the McGraw-Hill books "Mobile Telecommunications Networking with IS-41," and "Wireless Telecommunications Networking with ANSI-41, 2nd edition" published in 1997 and 2001, respectively. These books have sold several thousand copies and were required reading for mobile engineers at AT&T Wireless and Motorola for several years. The

-2-

DECLARATION OF RANDALL A. SNYDER

latter book has also been relied upon and cited numerous times as a reference for various Short Message Service (SMS) patents in the mobile industry, such as Method and Apparatus for Routing Short Messages, US Patent #6308075, Method and System for Wireless Instant Messaging, US Patent # 7058036 and Automatic In-Line Messaging System, US Patent # 6718178. I have been granted several patents myself on mobile networking technology and currently have three additional patent applications filed in the area of Short Message Services for mobile technology. I have also authored several articles on mobile telecommunications technology and have been quoted numerous times in industry trade publications. I have consulted and been employed for many mobile telecommunications companies including McCaw Cellular, AirTouch, AT&T Wireless, Lucent, Nokia, Ericsson, Nextwave, MCI, Sprint and other mobile technology vendors and service providers. I was a founder of m-Qube, Inc. (acquired by Verisign, Inc. in 2006), which develops and markets mobile text messaging services. I was also nominated in 2006 for a National Television Arts Emmy Award for Outstanding Achievement in Advanced Media Technology for unique mobile technology I designed while employed at Entriq, Inc. Still more detail as well as details of publications that I have authored or co-authored within at least the past 10 years are provided in my attached *curriculum vitae*.

**II. Overview of Facebook Mobile**

4. Facebook, Inc. provides an online application that employs what is commonly known as internet-based social networking functionality. Within this online application, Facebook provides a feature known as Facebook Mobile. Facebook Mobile enables Facebook users to communicate with each other via mobile text messages. That is,

-3-

DECLARATION OF RANDALL A. SNYDER

mobile text messages can be sent by online Facebook users to Facebook Mobile users who have registered for such mobile capability. Similarly, mobile text messages can be sent by Facebook Mobile users to other Facebook Mobile users.

5. Sending a mobile text message to a user via the Facebook application requires that the message sender know the name or alias of another user with which they wish to communicate. A mobile text message can only be sent to a user if that user has registered a mobile telephone number within their personal profile of the Facebook application. A text message is sent to a user from the Facebook application to mobile telephone numbers within another user's profile. The message sender never actually knows the mobile telephone number of the intended message recipient to successfully send the text message. The Facebook application enables sending of mobile text messages to mobile phones pseudonymously, if they wish, using only names created within their profiles.

**III. Settlement Agreement**

6. The settlement agreement reached in this matter (i.e., the "Settlement Agreement") requires Facebook to implement three main corrective actions: (1) brand each text message sent out as originating from "Facebook"; (2) include specific opt-out instructions in the body of every 15th text message Facebook sends to a particular telephone number; and (3) undertake commercially reasonable measures in cooperation with wireless carriers to prevent recycling of mobile telephone numbers.

7. Based on my experience and familiarity with the industry, I believe these steps will reduce the amount of unauthorized charges to the class for the following reasons: (1) the number of non-consenting recipients who will be confused as to the source of

-4-

DECLARATION OF RANDALL A. SNYDER

Facebook's text messages, as occurred in the Plaintiff's case, will decrease and cause opt-out rates to increase; (2) the increased frequency with which recipients of Facebook Mobile text messages will receive opt-out instructions (approximately twice per month) will cause opt-out rates to increase; (3) the medium through which opt-out instructions will be communicated (i.e., a text message – the user's medium of choice) will cause opt-out rates to increase; (4) the medium through which the act of opting-out will be exercised as part of the Settlement Agreement's opt-out instructions (i.e., a text message – again, the user's medium of choice) will cause opt-out rates to increase; and (5) Facebook's enhanced coordination with the wireless carriers as provided by the Settlement Agreement will mitigate the ill-effects of recycled mobile telephone numbers.

### IV. Facebook Mobile Growth Rate

8. It is my understanding that approximately 14 million mobile text messages were sent to mobile phones via the Facebook Mobile application in January, 2007. Furthermore, it is my understanding that approximately 59.9 million mobile text messages were sent to mobile phones via the Facebook Mobile application in January, 2008 by approximately 1.78 million Facebook Mobile users, per Facebook's estimation. Therefore, each Facebook Mobile user received an average of 33.6 text messages in January, 2008 via the Facebook Mobile application. Based on this and other figures provided by Facebook, between January, 2007 and January, 2008, Facebook

-5-

DECLARATION OF RANDALL A. SNYDER

experienced an average month-to-month growth rate in text message volume of 12.9%.[1]

9. Assuming this rapid growth rate is not sustainable based on both the waning novelty of the Facebook Mobile application among users as well as a natural anticipated decline in ongoing growth rates, I believe a conservative monthly growth rate through mid-year 2010 in the range of 9% to 11% is reasonable. Although the terms of the Settlement Agreement provide for a period of 27 months during which Facebook will implement the corrective action, for purposes of my calculations in this declaration, I have limited that period to 24 months as I assume opt-out rates will not materially change from the status quo (as defined by Facebook's discovery responses) before the fourth month of implementation. This assumption is based on the likelihood that the opt-out rate will not increase above the status quo until the corrective action is allowed to take root throughout the Facebook Mobile user base. Therefore, for the purposes of this declaration, I assume that the corrective action will start in July, 2008 and end no sooner than June, 2010 (i.e., the "Settlement Period").

10. At this 9% to 11% monthly growth rate in the volume of mobile text messages sent to mobile phones from the Facebook application, by June, 2010 a cumulative total of between approximately 7.8 billion and 11.4 billion additional text messages will have been sent. The following table shows the figures for 9% and 11% month-to-month growth through June, 2010.

---

[1] Comparatively, 48 billion text messages are sent nationwide each month, a 157% increase from one year ago (Steve Largent, President and CEO, Cellular Telecommunications and Internet Association, April 1, 2008 Keynote Address, *CTIA2008*, Las Vegas, NV).

-6-

DECLARATION OF RANDALL A. SNYDER

| MONTH | # TEXT MESSAGES (9% GROWTH PER MONTH) | # TEXT MESSAGES (11% GROWTH PER MONTH) |
|---|---|---|
| January 2008 | 59.9M (provided by Facebook) | 59.9M (provided by Facebook) |
| February 2008 | 65.3M | 66.5M |
| March 2008 | 71.2M | 73.8M |
| April 2008 | 77.6M | 81.9M |
| May 2008 | 84.6M | 90.9M |
| June 2008 | 92.2M | 100.9M |
| **July 2008** (start corrective action) | 100.5M | 112M |
| August 2008 | 109.5M | 124.3M |
| September 2008 | 119.4M | 138M |
| October 2008 | 130.1M | 153.2M |
| November 2008 | 141.8M | 170.1M |
| December 2008 | 154.6M | 188.8M |
| January 2009 | 168.5M | 209.6M |
| February 2009 | 183.7M | 232.7M |
| March 2009 | 200.2M | 258.3M |
| April 2009 | 218.2M | 286.7M |
| May 2009 | 237.8M | 318.2M |
| June 2009 | 259.2M | 353.2M |
| July 2009 | 282.5M | 392.1M |
| August 2009 | 307.9M | 435.2M |
| September 2009 | 335.6M | 483.1M |
| October 2009 | 365.8M | 536.2M |
| November 2009 | 398.7M | 595.2M |
| December 2009 | 434.6M | 660.7M |
| January 2010 | 473.7M | 733.4M |
| February 2010 | 516.3M | 814.1M |
| March 2010 | 562.7M | 903.7M |
| April 2010 | 613.3M | 1003.1M |
| May 2010 | 668.5M | 1113.4M |
| **June 2010** (end corrective action) | 728.7M | 1235.9M |
| **TOTAL** (April 2008 – June 2010) | **7.8 Billion** | **11.4 Billion** |

DECLARATION OF RANDALL A. SNYDER

11. Assuming the rate of messages received by Facebook Mobile users in January 2008 (i.e., 33.6 messages per month) remains the same throughout the Settlement Period, this analysis translates to between approximately 21.7 million and 36.7 million Facebook Mobile users in June, 2010. I believe this is a reasonable estimate for the growth rate of the Facebook Mobile application based on my knowledge of industry adoption rates for mobile data, user turnover as a result of the corrective action, attrition and text messaging services.

**V. Text Message Cost**

12. Based on my knowledge and experience in the wireless industry, as well as an understanding of the various wireless carrier plans, bundles and costs for ad hoc text messaging, it is my opinion that each of these messages can generate an approximate average fee of up to $0.15 per message. AT&T Mobility, Verizon Wireless, Sprint Nextel and T-Mobile, the four largest domestic wireless carriers by market share, all charge individual text message fees of $0.15 per message, according to their respective websites, and such amount may increase over the Settlement Period.[2] The various text message plans that each of these wireless carriers offers equate to text

---

[2] See text messaging rate plans for AT&T Mobility, LLC; Cellco Partnership d/b/a Verizon Wireless, Sprint-Nextel Corporation and T-Mobile USA, Inc., at:
https://www.wireless.att.com/media/multimedia_messaging_purchase,
http://www.wireless.att.com/learn/messaging-internet/messaging/international.jsp,
http://products.vzw.com/index.aspx?id=messaging_im,
http://b2b.vzw.com/international/Text_Messaging/index.html,
http://support.vzw.com/features/data_services/txt_messaging.html
http://nextelonline.nextel.com/en/services/messaging/textmessaging.shtml?id16=15_t ext_rate&id12=iSearch_MA_text,
http://www.t-mobile.com/shop/addons/services/MessagingDisclaimer.aspx,
http://www.tmobile.com/shop/addons/services/TzonesDetail.aspx?tp=Svc_Tab_TZon es&tsp=Svc_Sub_Messaging&tssp=Svc_Sub_TextMessaging&oscid=4CD51BA7-B5AF-4AB2-85E0-50EC0AF141F9

-8-

DECLARATION OF RANDALL A. SNYDER

message fees of $0.10 per message as long ago as the Fall of 2005, according to a study on the industry at that time published by researchers at Pennsylvania State University.[3] Similarly, the Plaintiff in this action states that she was charged $0.10 by her wireless provider, Verizon Wireless, for her receipt of each text message.[4] These fees are ordinarily charged for both sent and received messages and appear as line item charges on one's cell phone bill. Therefore, I believe an average fee of between $0.10 and $0.15 per text message both sent and received is reasonable.

**VI. Rate of Improper Charges**

13. There are several reasons why mobile subscribers may be subject to ongoing improper charges for mobile text messages sent to them via the Facebook Mobile application. Among these reasons are the recycling of mobile telephone numbers wherein a mobile subscriber obtains a previously used mobile telephone number with a new mobile subscription. The previous user of the mobile telephone number is a registered user of the Facebook Mobile application and has not changed the mobile telephone number registered in his or her Facebook Mobile profile. Therefore, I believe it is reasonable that as much as 1% to 2.6% of the improper text message charges may be attributable to mobile telephone number recycling, according to statistics provided by the FCC.[5]

---

[3] See *Exploiting Open Functionality in SMS-Capable Cellular Networks*, November 11, 2005, Alexandria, Virginia, USA. © 2005 ACM 1595932267, at: http://www.smsanalysis.org/smsanalysis.pdf.
[4] Comp., ¶29
[5] See *Implementation of Section 6002(b) of the Omnibus Budget Reconciliation Act of 1993, Annual Report and Analysis of Competitive Market Conditions With Respect to Commercial Mobile Services, Eleventh Report*, 21 FCC Rcd 10947, ¶ 145 (Sept. 26, 2006). Cellular carriers estimated that 1.5% to 3% of their user base terminates cellular service on a monthly basis in 2005. When a telephone subscriber terminates service and

-9-

DECLARATION OF RANDALL A. SNYDER

14. Another reason is that some mobile subscribers are legitimately registered Facebook Mobile users, but when they received text messages from other Facebook users, there were – prior to the Settlement Agreement - no instructions delivered with the messages that provided any indication of how to stop receiving them. In fact, if text messages were sent by mobile subscribers in response to the received Facebook Mobile text messages attempting to make them stop, they would be charged for the response text messages and they would have no effect.

15. Furthermore, according to a 2006 survey by Silverpop Systems, Inc., a provider of email marketing solutions, as many as 2% of subscribers to email marketing offers choose to opt-out of receiving additional emails when given the opportunity to do so.[6] It is reasonable to surmise that a similar percentage of subscribers to a text messaging application would choose to opt-out as well if given the opportunity. According to a September, 2007 study by M:Metrics, Inc., an international mobile media authority, "The early days of SMS advertising are similar to the advent of email..."[7] The advertising referred to comprises applications that mobile subscribers have opted-in

---

the subscriber's number is disconnected, it must either be recycled or ported to a new carrier by law. 47 C.F.R. § 52.15(f)(ii) (2007). In 2005, the combined national cellular subscriber base totaled 207 millions subscribers. Id., Table 1. Thus, nationally, some 3.1 to 6.2 million cellular subscribers terminated their service per month in 2005. Of those terminating cellular subscribers, only 887,000 of those subscribers took their phone numbers with them by porting the number to a new carrier – and the remainder left their number behind, to be recycled by the old carrier. Id., ¶ 147. Thus, it is reasonable to infer that 2.2 to 5.4 million cellular subscribers left their numbers behind to be recycled by their old carrier each month – or 1% to 2.6% of the national cellular subscriber base.)

[6] See 2006 Email List Growth Study. Silverpop Systems, Inc.; http://www.silverpop.com; © 2007 Copyright Silverpop, Atlanta, GA.
[7] See Spain Has Largest Audience for SMS-Based Mobile Advertising. M:Metrics; http://www.mmetrics.com; © 2007 Copyright M:Metrics, Inc., Seattle, WA.

-10-

DECLARATION OF RANDALL A. SNYDER

to. I believe even a higher percentage of subscribers to a text messaging application, like Facebook Mobile, would choose to opt-out. This is due to two primary factors:

1. Unlike email applications, mobile subscribers have to effectively pay for each and every mobile text message received whether that be on a line item basis or along with a bundled package.

2. Mobile subscribers are more apt to opt-out due to an ever-increasing volume of receiving unwanted mobile spam and mobile advertisements. Mobile subscribers tend to be more aware of each message received and they have no mechanism available to them to personally filter SMS messages of certain types, similar to the way email can be filtered through an email client application like Microsoft's Internet Explorer.

16. Another reason is that some mobile subscribers are charged for Facebook Mobile text messages sent to their mobile phones when their phones do not support text messaging. Charges for these text messages appear on their phone bills although messages were never received and in fact, the subscriber has no idea they were even sent. And yet another reason is that a wrong mobile telephone number could have been registered within the Facebook Mobile application, either intentionally or not, causing undesired messages to be received by mobile subscribers.

17. While I believe the opt-out rate will be materially higher for these reasons than the 2% determined for commercial email, out of an abundance of caution, I limit my estimate of the number of Facebook Mobile recipients who can be expected to respond to the opt-out instructions sent at regular intervals in the body of the text messages, as required by the Settlement Agreement, to 2%.

### VII. Conclusion

18. I believe a reasonable estimate of 2.9% to 4.6% of the cost to recipients of text messages from Facebook (1% to 2.6% for number recycling and 2% for responding to the embedded opt-out instructions) over the Settlement Period may be improper charges, but for the corrective action taken by Facebook pursuant to the Settlement Agreement.

19. My opinions in this declaration are based upon extensive experience in the wireless industry, a detailed understanding of how mobile text messaging services operate, a detailed understanding of telephone number administration within the wireless industry and personal experience as a user of the Facebook Mobile application. If called to testify, I could and would testify competently about these opinions.

Pursuant to 28 USC § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on: May 7, 2008

*Randall A. Snyder*
Randall A. Snyder